557 United States v. Witt. We have Ms. Lowenthal here for the appellant and Ms. Acosta here for the appellee. Ms. Lowenthal, you're going to start with 11 minutes. Yes, your honor. Thank you. Good morning and may it please the court. I am Cheryl Lowenthal. I am court appointed counsel for the defendant, Danyel Witt, who comes before this court having been sentenced, having been convicted on four counts related to fraud, defrauding the government in the agriculture department and farm disaster monies, and she was sentenced to 28 months in custody. Now, the sentence was four months for the first three charges, which was within the guidelines, it was four to ten months, and then there was an additional 24 months consecutive because the last charge was identity theft because it was alleged and she was convicted by a jury of stealing the identity of her daughter to submit an application on behalf of the daughter for additional farm disaster relief funds. Now, the total of funds that went to Ms. Witt was approximately $9,000. There was one payment of $3,000 and another payment of over $6,000 to it for a total of nine. The mastermind of this scheme was an individual by the name of Dwayne Crosson. Mr. Crosson was the district manager for the U.S. Department of Agriculture Farm Bureau in the northwest district of Florida for three counties. In 2016, there had been apparently a drought and farmers lost crops and also their livestock as a result of the drought, and they made claims to assist them to get through and beyond their losses during their drought from their farms. Mr. Crosson came up with an idea that he would elicit a number of, he would contact a number of his friends and people that he knew in the northwest Florida area and suggest to them that even if they didn't really sustain losses or damages due to the drought, that he could get them, if they were to file claims, he would see to it that the claims got paid and he would, of course, expect a kickback. Now, Mr. Crosson was the lead defendant. He was charged in all 38 counts and he was responsible for a loss to the United States government of approximately $400,000. And due to his testimony and his cooperation and getting 29, there were 29 indicted, 28 other people involved in this scheme, he ended up with a sentence that was not that much longer than the sentence imposed on Danielle Witt. She is presently incarcerated at the Federal Medical Center, Federal Medical Facility in Carswell, Texas, because she was a very sick woman. She had pancreatic cancer, which of course is a very deadly form of cancer. She had a Whipple procedure, which I am not a medical specialist but I do understand that it is a very complicated and delicate procedure and she did survive it. And then she's had some intermittent or idiopathic perhaps, uterine bleeding. So this woman, she had doctors, she was under treatment and so when they designated her they put her in Carswell. If I could interrupt you. Yes, yes. It seemed clear from the transcript that the district judge probably would have sentenced her to less time had he had that opportunity, but he felt that he was bound by the two-year mandatory consecutive sentence. And isn't that the case? It doesn't look to me like he had any choice as to that two-year sentence. You are correct, Your Honor, but as her defense counsel at trial argued under sentencing guidelines 5C, maybe 1.1, that there would be an option for a judge to put a person on home confinement even if it were a mandatory minimum sentence instead and just as a matter of humanity and personal care and that would have been a more appropriate way to punish her. Home confinement is certainly not, it's better than being in a federal prison, but it's certainly not being out free and able to do everything and anything you want. You're confined to your home except perhaps for medical appointments or maybe going to church and you have to call in every day. There are a lot of very strict, strict requirements. So it would have been a, while not an incarcerative sentence, it would have been a punishment. But it wasn't imprisonment. No. It wouldn't be imprisonment. And doesn't the statute require imprisonment? It does. As the trial counsel argued, the sentencing guidelines indicated that even a mandatory sentence could be served under home confinement, whether he was right or wrong. I guess the judge determined he was wrong. This court may decide the same thing, but we would submit that that would have been a more humane and appropriate sentence. I think the problem that you have is not, your equitable argument is a very powerful one. I mean, the amount of the fraud was so small, you're talking less than 10 grand in the aggregate. Yes. Very sad case. They chose to prosecute it, though, this way. And they chose to add the charge of aggravated identity theft. And once there's a conviction of that, I, like Judge Middlebrooks, I don't see how you get around the mandate of the statute which says whoever during and in relationship to a felony violation enumerated in blah, blah, blah shall, in addition to be punished for such felony, be sentenced to a term of imprisonment of two years. There's nothing precatory. It's totally mandatory. And I don't see how the guidelines gets you out of that. Well, it's just... So that's the problem that I'm having. I think the problem is the way the case was charged but that's a decision for the executive branch, not us. And you're correct that Judge Wetherill did say more than one time during the sentencing, if I had the discretion to impose a lower sentence, this sentence would be lower. Now, 25 of the defendants pled guilty. Ms. Witt went to trial with two other co-defendants. Those two co-defendants were both acquitted. And Dwayne Crosson was the star government witness against all these people. And if the jury didn't believe Mr. Crosson against the other two defendants, it just seems, and I could be wrong, but that it was this identity theft issue. And the daughter testified against Danielle Witt. Her mother testified against Danielle Witt. Probably the nicest person who testified from the family was her stepfather, Mr. Graham, who was actually the owner of the farm and the owner of the livestock on the farm. But the application was made out in Danielle Witt's name and that application was Exhibit 1 at the trial. That application was not signed by Ms. Witt. I don't have a copy of it with me but I'm sure that the court has all the exhibits. The application was not signed. And an official from the U.S. Department of Agriculture testified that any application that is not, it was dated, but not signed, any application that's not signed should never have been paid to begin with. And the reason, and something that occurred to me over the past few days reviewing these transcripts and reviewing these briefs is that the government said, well, Ms. Witt gave Mr. Crosson the Social Security number for her daughter, which allowed him to go ahead and submit this, the false application. Well, Ms. Danielle Witt and her daughter, Ms. Sage Evans, were housekeepers in Mr. Crosson's home. They worked for him. And so it would seem to me if he were a normal law-abiding citizen he would know their Social Security numbers because he would be required to report to the IRS on 1099s as, I guess, independent contractors. So he had access to that information without Ms. Witt having to give it to him. And this case was just a sorry airing of family disputes and family laundry in public, in court, which just seemed so pathetic and unnecessary. It is just a very sad and pathetic case. And I might also quickly say that there was a new trial based on, not on sufficient evidence, but the weight of the evidence. And under case law in this court, there's a 1985 case, it's cited on page six of the appellant brief, and it says, in considering whether a new trial should be granted based on weight of the evidence, the court does not have to view the evidence in the light most favorable to the verdict and may consider the credibility of the witnesses. Well, Mr. Crosson had numerous conflicts in his testimony in court and also in the written statement that he gave to the agents in the debriefings. He said that he approached Ms. Witt and suggested to her that he knew a way that she could get some money if she just said that she, if she just filed this application regarding animals on her stepfather's farm. And she lived on the farm, she cared for the goats on the farm, but she did not own any cattle. Let me ask you just one question if I can, Ms. Lowenthal. As I understand the appropriate standard we have to apply, in Martinez we said that for such a motion to be justified, the evidence must preponderate heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand. We went on to say that motions for new trials based on weight should be granted by courts only sparingly and with caution and only in those quote really exceptional cases. Your argument is more of an equitable argument about my God, even if they had enough for a jury to find the requisite state of mind beyond a reasonable doubt, putting her in jail for 28 months for, 28, 28, it was 28 months right? Well 24, plus 4, the additional 24 months for a total fraud in her case that amounted to 2400 bucks when the daughter got 6400 bucks seems like overkill when she's dying of pancreatic cancer. But it seems to me your argument is more appropriately, and I may have missed this, addressed to the executive branch of government and the Bureau of Prisons rather than to this court. What have I missed? No, your honor is correct and I just have a strong sense of justice and fairness and it just seemed horrible to me what happened to her but... Oh I understand. Have you considered, I don't want to unnecessarily raise expectations, but have you considered a motion for compassionate release directed to the Bureau of Prisons? I believe, well I don't know that Ms. Witt has filed the administrative paperwork with the Bureau, I honestly don't know if she has, she hasn't mentioned that to me. Okay, alright. Can I ask just one final question? Certainly. How long has she been incarcerated to date as we sit here today on June the 8th? It has been well over one year. I can tell you exactly. Very well, thank you so much. You've got four minutes remaining, Ms. Acosta, let's hear from you. Good morning, your honor. Winifred Acosta, ACOSTA, Assistant U.S. Attorney on behalf of the Appellee of the United States. May it please the court. Before I begin, I'd like to make a correction on a miscitation to Mr. Carlson's testimony in the brief. It should be the record 917, not R916. The government apologizes for any inconvenience. The decision to grant or deny a motion for new trial is within, based on the weight of the evidence, as is the case here, is within the sound discretion of the district court. Here, there was no clear abuse of discretion. The evidence does not preponderate heavily against the verdict. Can you explain how the application or the agreement was entered into evidence unsigned? How did that happen? And what was the explanation for not having a signed copy? There was a representative from the U.S. Department of Agriculture who authenticated the unsigned application LFP form. LFP is Livestock Forage Program. There was, frankly, not much testimony with regards to the explanation for not having the signed application. The Exhibit 1, which was Ms. Witt's application, was e-signed by Mr. Carlson. However, the court is correct. It was not signed, however, by Ms. Witt herself. There was testimony from Mr. Carlson that Ms. Witt, in fact, signed the form on August 4th of 2017. Ms. Witt also testified that she went to the FSA building on that date. She provided her Social Security number on a piece of paper. She also provided a blank check. That blank check would have reflected the bank account information, the account number, and the routing number. All of that information was necessary for the claim to have been processed and for the department to issue the payment. And as the district court found, Ms. Witt, by her own conduct, facilitated in the scheme to defraud by providing necessary information, which was needed for the processing of the claims. Mr. Carlson's testimony was not incredibly untrustworthy. In fact, the jury believed him with regards to Ms. Witt's culpability, and the district court judge also believed him. In fact, at the sentencing hearing, when the district court judge ruled in Ms. Witt's favor on the obstruction enhancement, the court clearly stated that there was no doubt that Ms. Witt was involved. Her conduct helped facilitate Mr. Carlson in getting the information that he needed in order to process the claims. Ms. Witt provided inconsistent testimony on her understanding of the representations made by Mr. Carlson to her on the issue of eligibility. At one point, she stated that Mr. Carlson advised her, well, you'll be able to qualify. That's found in the record, 918, page 755. Later she testified, I didn't know if I was going to qualify. That's found on page 764. Then Ms. Witt testified that Mr. Carlson said, I may qualify. When asked about the accuracy of the figures presented on her application for the LFP funds, Ms. Witt testified that there were 40 to 45 goats on the property, her parents' property that she claimed 100% ownership. Lo and behold, the actual figure that was on the form was 45. It was within the range that she herself testified to. The government believes that is indicative of collaboration, which is supportive of Mr. Carlson's testimony. Can I ask you a fact question? Yes, Your Honor. Is it correct that the amount of payment that she wrongfully received was $2,885? Yes, Your Honor. That was for the first payment issued in her name. The second payment was issued in her daughter, Ms. Evans' name, in the amount of $6,776. That was the totality of her involvement in this scheme? Yes, Your Honor. I would also point out that on the same date that the payment was issued in her daughter's name, the deposit was made on September 7th of 2017. On that very same date, Ms. Witt withdrew, transferred over half of those funds in the amount of $3,500 into her own savings account. Again, that shows her involvement. My question is not whether you can show culpability, scienter, the state of mind. If you credit Carlson and the others, speaking for myself, the answer is clear. The jury was more than enough to credit it. The amount of fraud that she profited was about $6,000? $2,885 and $6,776, so it was under $10,000. $6,776, she only took half and the other half went to the daughter? I just want to be correct on this. There was no evidence that the other half specifically went to the daughter. We do know that Ms. Witt herself withdrew or transferred $3,500 of that amount. That was reflected on Exhibit 28, which was the bank statement.  There was no testimony that I can recall on that. It is also important to note that the joint account was established looking at government's Exhibit 28, the bank account statement of the joint account, that account was established by August 23, 2017. How do we know that? Because looking at the statement, that activity starts on August 23, 2017. The application in Ms. Evans name was generated on September 1, 2017. Mr. Carlson would not have had the ability to establish the joint account. In fact, Ms. Evans testified, the daughter testified, she is referring to her mother, she kind of made me believe it was better to be on the same account with her. That is found in the record 916, page 210. The person who had the most to gain financially from the establishment of the joint account was in fact Ms. Witt. Again, on that same very date of the deposit, she is the one who testified. It is important to point out that Ms. Witt took the stand, she testified. Apparently, the jury disbelieved her testimony and the jury was able to consider her testimony as substantive evidence of her guilt. Ms. Witt took the stand and completely denied ever taking her daughter to the FSA building, ever. But then, the government presented testimony that not just Mr. Carlson disputed what Ms. Witt was saying, but also her daughter. And their testimony was consistent on the material points. They both said how Ms. Witt drove Ms. Evans to that location in the parking lot and how Mr. Carlson came out of the building with the forms and gave the forms to Ms. Witt who was sitting in the driver's seat. She then gave the forms to Ms. Evans. Even though initially Ms. Evans did testify that she did not recognize her signature, she explained that she did not have the benefit of a book or a clipboard and she explained that writing directly on your lap can distort your signature. So that was very much explained. And again, their testimony totally contradicted what Ms. Witt said. There was no honestly held belief or mistake in judgment. There was no good faith that Ms. Witt had. Ms. Witt knew exactly what she was doing and that's the reason she didn't tell her parents that she had applied for these funds. That's why she admitted that she tried to get the mail before her parents did. Because the government submits, she didn't want them to find out. So the government's argument is that there was no clear abuse of discretion. This is not an exceptional case where the evidence preponderates heavily against the verdict and we would ask that this panel affirm the judgment and sentence. I know I have five minutes left. I can briefly address issue two if the panel has any questions. Why don't you address the second argument she made. That is to say whether the district court got it right or misunderstood her authority to sentence Ms. Witt to home detention in the face of a mandatory minimum statute. Your Honor, the district court got it right. The district court did not have discretion because there was a statutory minimum mandatory sentence imposed via 1028 A.A.1. Consecutive 24 months. All the district court did was apply the low end of the guideline range. There was no procedural error and looking at the factors that the district court pointed out that Ms. Witt was dissimilar to the other defendants because they had no criminal history. She did. And they expressed remorse. She didn't. The district court also was not convinced that Ms. Witt would not commit any future crimes. And given the fact that this was a serious offense. But even if the opposite had been true, the district court would not have been able to impose the power, would he? That's correct. Yes, Your Honor. That is correct. The district court was bound by the statute to impose the consecutive 24 months. And that's what the district court did. The district court conducted an individualized assessment considering the totality of the circumstances and the 3553A factors and imposed a procedurally and substantively reasonable sentence. I just have one other question. I was curious. The co-defendant, the lead co-defendant, Dwayne Croson, who was the government's star witness in the case, entered a plea of guilty in the case. What was his sentence? Your Honor. If you know. Your Honor, I actually don't have his sentence. I was curious. It's not in this record. If you don't know, that's fine. Your Honor, I was just curious if you knew. I apologize, Your Honor. I don't have that information. I know that he did plead to 38 counts. Okay. Very well. Thank you, Your Honor. The government would ask that this panel affirm the judgment and sentence in its entirety. Thank you. Thank you very much. Ms. Lowenthal, you have four minutes of rebuttal time. Thank you. Danielle Witt had a bank account. She wanted her daughter to be a joint owner of that bank account because she thought she was dying. That's why her daughter was on the joint bank account. Secondly, she's put in a federal medical center at Carswell, Texas. I think the medical care there, you would think it would be state of the art and really wonderful. It is not. It may be better at Butner, maybe better up in Rochester. I don't know if it's under funding, under staff. During COVID, in the middle of COVID, she was thrown into a federal prison. Twenty-five of the co-defendants pleaded guilty. I think that everyone knows that people sometimes plead guilty, even though they are just not guilty, but innocent of the charges because of the fear of the trial tax and the trial penalty, which we all know is real, whether we'd like to talk about it or not. They figure if they go to trial and are convicted by a jury, their sentence will be a whole lot higher than what the government is offering them today if they plead guilty. We have 25 guilty pleas. The two co-defendants that went to trial together with Ms. Witt were both acquitted by the jury on the same fact that the daughter testified against her mother. Perhaps, since she was one of the beneficiaries of one of these claims that that over $6,000 received, I'm not suggesting that the government pressures people. Either you want to testify or we're going to charge you. I'm not suggesting it happened here, but that has been known to happen in some ways. In his investigation and his statements that he signed with the government and notarized under oath, he said that he approached Daniel Witt and said, I know you've been sick, you've got expenses, you may need a little extra money, I know how you can get some. At the trial, he said, Daniel Witt approached me and she said she saw something about Facebook, about people being able to get money. She asked me if I could help her get some money. His testimony was not entirely without conflict. Why the jury found her guilty I really think had a lot to do with what her daughter said about her on the stand. On cross-examination, defense counsel elicited from Sage Evans that during her several meetings with prosecutors, it was made clear to her that the witnesses' stories should be straight, that they should be consistent when they got into the courtroom. That's in the record in the cross-examination. Jury didn't believe Croson regarding the two co-defendants who were on trial with Ms. Witt. I would suggest that this case indeed is a serious miscarriage of justice as referenced in the Martinez case and that the court should consider reversing, vacating the conviction for all of these reasons. One final thought, I just wanted to underscore the suggestion that my colleague Judge Newsom made, which is that this might be a case for you to consider filing an appropriate application, a hardship application with the Bureau of Prisons on behalf of your client. I will certainly suggest if she has not done that, I will most certainly take care of that on an immediate basis. Thank you. Thank you very much. I noticed, Ms. Lowenthal, that you've been court-appointed. Thank you very much for your service to the court and the service of justice. Thank you very much.